UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| JAMES M. SCHATZ, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 10-528-B-H |
| | ) | |
| REPUBLICAN STATE | ) | |
| LEADERSHIP COMMITTEE, et al., | ) | |
| | ) | |
| Defendants | ) | |

## DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS

### Introduction

Elections unsurprisingly are often rough-and-tumble events. But candidates become justifiably outraged when they are falsely accused, especially when the close date of the election prevents an effective rebuttal, and especially when the accusation is made not even by the opponent but by relatively anonymous outsiders. Nevertheless, in the service of robust public discourse, the First Amendment protects statements made in a campaign even if they turn out to be false—unless the speaker knows the statements are false, or makes them with reckless disregard for their truth. It is on that basis that, after oral argument on April 4, 2011, I **Grant** the motion in this case to dismiss the claims of an aggrieved 2010 candidate for the Maine Senate.

**FACTS ALLEGED IN AMENDED COMPLAINT AND ATTACHED EXHIBITS**

According to the Amended Complaint, the plaintiff James M. Schatz has been active in Maine politics, as a member of the Maine House of Representatives from 2004 through 2010, and as a Blue Hill Selectman during at least 2008 and 2009.[1]  Schatz ran as a Democratic candidate for the Maine Senate in the November 2, 2010 election, but lost.[2]

The defendants are the Republican State Leadership Committee, a political action committee incorporated in Virginia and registered in Maine; the related but unincorporated Republican State Leadership Committee—Maine PAC, also registered in Maine; Crossroads Media, LLC, a Republican media services firm; another firm that produces flyers or brochures; and other related entities and individuals.  The national mission of the Republican State Leadership Committee is to elect Republican candidates in the various states;[3] the mission of the Republican State Leadership Committee—Maine PAC is the same, but limited to Maine.[4]  I shall refer to all the defendants collectively as the Republican State Leadership Committee because the Amended Complaint asserts that the actions of which it complains were generated by those two organizations.[5]  The Republican State Leadership Committee opposed Schatz's

---

[1] Am. Compl. ¶¶ 2, 41 (Docket Item 37).  The Amended Complaint does not reveal Schatz's dates of service as a Selectman, but does assert actions by him as a Selectman during those two years.  Id. ¶ 41.

[2] I take judicial notice that Schatz lost the election.  According to the Maine State Senate website, Senator Brian D. Langley now holds the seat.  *Maine Senate: Senator Brian D. Langley*, MAINE.GOV, http://www.maine.gov/legis/senate/bio28s.htm (last visited April 6, 2011).  The other facts come from the Amended Complaint ¶ 2.

[3] Am. Compl. ¶¶ 4-5.

[4] Id. ¶ 8.

[5] The Amended Complaint states that those two organizations were prompted to act by the President of the Republican State Leadership Committee and the President of Crossroads
*(continued next page)*

Democratic Senate candidacy in the 2010 election and supported that of his Republican opponent.[6]

Schatz is aggrieved by certain brochures, flyers, television and radio advertisements that the Republican State Leadership Committee mailed, published and broadcast "a short time before the Maine election on November 2, 2010, giving [Schatz] neither time nor means to make an effective rebuttal to their false and defamatory content."[7] In essence, he says, they "contained false allegations that [Schatz], in his capacity as selectman of the Town of Blue Hill, Maine, had voted to cancel a $10,000 Fourth of July fireworks display, and that [Schatz] and other selectmen had improperly applied taxpayers' fireworks funds to a political contribution or political campaign."[8] I quote the text of one of the flyers, which is representative:

> *First Page*:
>
> No Rockets' Red Glare,
> No Bursting in Air.
> Thanks to JIM SCHATZ. . .

---

Media, LLC. Am. Compl. ¶¶ 11, 15, 33, 36. The identities and separate roles of the other defendants are not material to the motion to dismiss.
[6] Id. ¶ 8.
[7] Id. ¶ 42.
[8] Id. ¶ 35. The Amended Complaint attaches copies of the brochures or flyers as exhibits. Am. Compl. Exs. D, E, F. For the radio and television advertisements, it says that they "made, in essence, the same allegations as those contained in" the exhibits. Id. ¶ 36. One of the flyers distributed in the fall of 2010, Exhibit D of the Amended Complaint, refers to Schatz's decision as affecting "this 4th of July" whereas the news account about Blue Hill clearly refers to 2009. I raised this discrepancy at oral argument, but Schatz's lawyer did not pursue it. It is apparent that it is not the year that concerns Schatz, but the accusation that he had used Town funds in any year for a contribution to a political campaign rather than for Fourth of July fireworks.

3

> *Second Page*:
>
> > Jim Schatz voted to cancel the $10,000 fireworks celebration for the Fourth of July—blaming it on a bad economy.
> >
> > However, before canceling the show, Schatz and the Blue Hill Selectmen gave 10,000 taxpayer dollars to a political organization.
> >
> > It's wrong for Schatz to give your money to a political organization, and it was wrong for Schatz to cancel your 4th of July celebration.
> >
> > On November 2, Vote against Jim Schatz, because he's wrong for Maine.[9]

Schatz says that, in fact, it was the *voters* of the Town of Blue Hill who decided to spend $10,000 "to be used at the discretion of the Selectmen, as a contribution toward costs associated with the efforts to repeal Maine's school consolidation law."[10] It was in accordance with that vote, he says, that funds were paid to the Maine Coalition to Save Schools in installments ending with a final payment on July 3, 2009, and there was nothing wrong about the payments.[11] He says that the Blue Hill Selectmen voted 2-1 against funding a fireworks display for July 4, 2009, but that he, Schatz, voted *in favor of* funding the fireworks.[12] He also says that the two decisions were unrelated. The first, by the voters, was made at a Town meeting on January 2, 2008.[13] The second, where he was outvoted by the other two Selectmen, was made on March 3,

---

[9] Am. Compl. Ex. F. There are also two fine-print footnotes that cite two newspaper sources that I summarize later, and fine-print statements that the Republican State Leadership Committee—Maine PAC paid for the flyer, and not any candidate. This particular flyer is attached as Exhibit A to this opinion.
[10] Am. Compl. ¶ 41.
[11] Id.
[12] Id.
[13] At that Town meeting, the voters also voted to fund the *2008* Fourth of July fireworks. Id.

2009.[14]  Finally, Schatz says that the Republican State Leadership Committee's "only source of information" for the statements in its election missives was the reporting in two newspaper articles,[15] and that "[n]either newspaper article contained information that supported" the statements.[16]  He attaches the two newspaper articles as exhibits to his Amended Complaint.[17]

One of the articles is from the July 2, 2009, *Bangor Daily News*, and is a story about Maine towns struggling to fund fireworks for the then-upcoming July 4, 2009 celebrations.  It opens:

> There will be no fireworks display in Blue Hill this Fourth of July due to the poor economic climate, but business is booming elsewhere as municipalities and private groups have worked hard to raise funds to pay for the fire that lights up the nation's birthday.
> For the past two years the Hancock County town has fronted the money for the fireworks display for the Fourth to Remember celebration and paid the funds back through donations.  There's about $10,000 in the account, but the selectmen and the fireworks committee opted not to spend the funds this year.
> "Given the economy, we felt that in good conscience we couldn't do it this year," said Selectman Jim Schatz.  "We thought that to spend that much money on something that will light things up for a few seconds and then is gone was not the thing to do.  Unless we were sure we could pay the town back, we didn't want to pull the trigger on it this year."[18]

---

[14] Id.
[15] Am. Compl. ¶¶ 38, 40.  The flyers, in footnotes, cite the two articles as sources.  Am. Compl. Exs. D, E, F.
[16] Am. Compl. ¶ 39.
[17] Am. Compl. Exs. G, H.
[18] Am. Compl. Ex. G.

The other article is from the August 9, 2009, *Kennebec Journal*. The subtitle of the story states that "Cities and towns are being asked to help roll back school consolidation."[19] It opens:

> Starved for cash, the advocates pressing for a repeal of Maine's school district consolidation law are taking their fundraising appeal to the towns directly affected by the sweeping state mandate.
> The Maine Coalition to Save Schools, which had $140 on hand at the beginning of July, is seeking campaign contributions from municipalities that turned down district mergers or are unhappy with the consolidation arrangements their voters approved.[20]

A few paragraphs later, the article states:

> Blue Hill approved a $3,000 contribution to the effort in January 2008 and $2,000 more in July of last year. James Schatz, a Blue Hill selectman and a state representative, said the town recently paid $5,000 to the coalition as the last installment of a $10,000 commitment.[21]

The article also reports:

> While it's legal for municipalities' legislative bodies to dig into taxpayer funds to support political causes, the Maine Municipal Association, the lobbying arm for Maine cities and towns, advises against it.
> "Expressing one's view is one thing," association spokesman Michael Starn said. "Expending town funds to support their view is much more problematic."
> A municipality should generally take a position of "more fact gathering and factual dissemination, not advocacy as individual communities," Starn said.
> But municipal officials, he noted, are free to express their opinions on pending political matters, and a town's legislative body can approve resolutions supporting or opposing particular causes.
> "You do have a responsibility as a government official to approach this whole advocacy thing in a very responsible way," Starn said.

---

[19] Am. Compl. Ex. H.
[20] Id.
[21] Id.

> According to Dyer,[22] there's no reason that can't involve committing town funds to advancing a political cause.
> Town officials "make decisions all the time that are political in nature that involve spending taxpayers' dollars," he said.
> Schatz, the Blue Hill selectman, acknowledged that questions come up when municipalities contribute to political causes.
> But "a lot of the rural, small schools have been hurt" by consolidation, he said. "If (one) were to examine the issue, it would seem appropriate" to contribute to the repeal campaign.[23]

This article gives other views about the issue of contributing and concludes by reporting that the president of the Maine State Chamber of Commerce "said it was 'troubling' to see public funds collected as campaign contributions."[24]

### PROCEDURAL CONTEXT AND ITS EFFECT

Schatz has sued the Republican State Leadership Committee in this court for libel, intentional infliction of emotional distress,[25] and publicly placing him in a false light, all with actual malice. The Republican State Leadership Committee has moved to dismiss Schatz's Amended Complaint under Rule 12(b)(6) on the basis that it fails to state a claim upon which relief can be granted. The Committee argues that Schatz is a public figure, that the Committee's speech is therefore protected by the First Amendment unless

---

[22] Dyer is identified elsewhere in the article as someone "whose firm gathered many of the 60,000 voter signatures advocates submitted to the Secretary of State in order to force a November ballot question." Id.
[23] Id.
[24] Id.
[25] At oral argument, Schatz agreed to the dismissal of his claim for intentional infliction of emotional distress.

7

Schatz can prove actual malice, and that Schatz's Amended Complaint demonstrates that he has no basis for doing so.[26]

On a motion to dismiss I take all well-pleaded allegations in the Amended Complaint as true for purposes of the ruling.[27] Thus, I assume that the Republican State Leadership Committee's statements were false as Schatz alleges, and that all the knowledge the Committee had came from only the two newspaper articles. (At a trial, those assertions might or might not prove true.) The following principles also apply at the 12(b)(6) stage. Rule 9(b) states that malice "may be alleged generally." Where attached documents contradict the complaint's assertions about them, the documents control.[28] Finally, "'[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"[29]

## ANALYSIS

### *(1) Defamation*

Schatz maintains that the Republican State Leadership Committee statements were false and defamatory because in fact the two funding

---

[26] Defs.' Mot. to Dismiss at 1-2, 14-17 (Docket Item 32).
[27] Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009).
[28] Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000). Clorox quotes approvingly from a Seventh Circuit decision, N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 454 (7th Cir. 1998), that "[i]t is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."
[29] Rios-Colon v. Toledo-Davila, No. 09-2296, 2011 U.S. App. LEXIS 6456, at *6 (1st Cir. Mar. 30, 2011) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (in turn quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007))); see also Ocasio-Hernandez v. Fortuno-Burset, No. 09-2207, 2011 U.S. App. LEXIS 6763, at *23 (1st Cir. Apr. 1, 2011) ("in order to 'show' an entitlement to relief a complaint must contain enough factual material 'to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact),'" quoting Twombly, 550 U.S. at 555).

8

decisions were not related; the Blue Hill voters, not he, decided on the funding for the Maine Coalition to Save Schools; he voted in favor of, not against, funding the 2009 fireworks; the statement that the contributions to a political organization were "wrong" or a "misuse" of public funds accuses him of a crime; and photographic depictions of outrage on the faces of an adult and child in some of the flyers cement the defamatory nature of what is said in the flyers.

I have serious doubt that the false statements are defamatory in the legal sense of the term. (Certainly they could affect some people's decision on whether to vote for Schatz, but that is not the test of defamation.[30]) Nevertheless, I find it unnecessary to decide that issue because the Amended Complaint fails to make a sufficient factual allegation of actual malice, a necessary element of a claim against a public figure, given First Amendment protection of speech.[31]

---

[30] "A statement is defamatory 'if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" Rippett v. Bemis, 672 A.2d 82, 86 (Me. 1997) (quoting Bakal v. Weare, 583 A.3d 1028, 1029 (Me. 1990)). I doubt that these statements reach that level. I also reject Schatz's assertion that the statements can reasonably be construed as accusing him of a crime. Nowhere in the flyers is there reference to a crime, direct or indirect. Instead, as used here in referring to the spending decisions, the adjective "wrong" and the noun "misuse" sound like classic statements of opinion, typically protected. See Lester v. Powers, 596 A.2d 65, 71 (Me. 1991); Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 129 (1st Cir. 1997) ("The vaguer a term, or the more meanings it can reasonably convey, the less likely it is to be actionable"). I also find it unnecessary to decide whether Schatz was required to reproduce the actual text of the radio and television advertising, rather than state merely that they "made, in essence, the same allegations" as in the printed flyers and brochures. See Am. Compl. ¶ 36.

[31] Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 659 (1989); New York Times Co. v. Sullivan, 376 U.S. 254, 283 (1964).

Schatz concedes that as an elected official, he is a "public figure" for purposes of First Amendment analysis.[32] Indeed, the Supreme Court has said that "[t]here is little doubt that 'public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the New York Times rule'"[33] that protects speech directed at public figures. Under Supreme Court precedents, that means that false statements alone will not permit recovery. Instead, Schatz must allege (and ultimately prove) "actual malice," a term that means that he must allege and prove that the Republican State Leadership Committee made its statements with actual knowledge that they were false, or that it acted not just negligently, but with reckless disregard for the truth of its statements.[34] The Supreme Court has said that "[t]he question whether the evidence in the record in a

---

[32] Pl.'s Opp'n to Defs.' Mot. to Dismiss at 8 n.6 (Docket Item 34). The concession is appropriate in light of Michaud v. Town of Livermore Falls, 381 A.2d 1110, 1112 (Me. 1978).
[33] Harte-Hanks Commc'ns, 491 U.S. at 686 (quoting Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 300 (1971)).
[34] At oral argument, Schatz argued that only media defendants are entitled to the First Amendment protections in defamation cases that the Supreme Court afforded the traditional press in New York Times, 376 U.S. at 283. I agree with the vast majority of federal courts that have held otherwise and apply the New York Times rule here. See, e.g., Garcia v. Bd. Of Educ., 777 F.2d 1403, 1409-10 (10th Cir. 1985); Log Creek, LLC v. Kessler, 717 F. Supp. 2d 1239, 1249-50 (N.D. Fla. 2010). See also First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 777 (1978) (the "inherent worth of speech . . . does not depend upon the identity of its source, whether corporation, association, union, or individual"). Moreover, the speech here is about candidacy for elected office and spending priorities. That is speech about "public affairs" or "public issues"—according to the Supreme Court, speech that is "the essence of self-government," that "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." Snyder v. Phelps, 131 S. Ct. 1207, 1215 (2011) (internal quotation marks omitted). In Snyder, the Supreme Court applied that special protection to a non-media defendant, a church. Snyder did not invoke the New York Times rule (Snyder was not a defamation case), but in Garrison v. Louisiana, 379 U.S. 64 (1964), the Supreme Court did apply the New York Times rule in a non-media case (the issue in Garrison was whether to apply New York Times to criminal as well as civil cases).

defamation case is sufficient to support a finding of actual malice is a question of law."[35] According to the First Circuit:

> A public official advancing a defamation claim must show "that the [challenged] statement was made with a high degree of awareness of . . . probable falsity." In other words, the defendant must act either with actual knowledge of the falsity or with reckless disregard for the truth.[36]

Here, Schatz has used the words, "actual malice." The Amended Complaint states:

> [E]ach defendant acted with actual malice, having actual knowledge of the false and defamatory nature of the statements published by defendants in said flyers or brochures and in said television and radio advertisements, or, in the alternative, having reckless disregard of and with serious doubt about the truth or falsity of such statements.[37]

I do not need to decide whether, if Schatz had stopped there, he might have survived a motion to dismiss on the basis that Rule 9(b) allows malice to "be alleged generally."[38] Instead, Schatz went further and said:

> The only source of information on which the content of said flyers or brochures and said television and radio

---

[35] Harte-Hanks Commc'ns, 491 U.S. at 685.
[36] Levesque v. Doocy, 560 F.3d 82, 90 (1st Cir. 2009).
[37] Am. Compl. ¶ 44.
[38] It is doubtful, however. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1954 (2009) (citations omitted):
> It is true that Rule 9(b) requires particularity when pleading "fraud or mistake," while allowing "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." But "generally" is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8. And Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss.

11

> advertisements were based were two newspaper articles . . .[39]
> Neither newspaper article contained information that supported statements published by defendants as contained in said flyers or brochures and in said television and radio advertisements.
> No defendant conducted or authorized any additional investigation to ascertain the truth and non-defamatory character of statements published in said flyers and brochures and published in said television and radio advertisements.[40]

According to the First Circuit, "it is well-established that in reviewing the complaint, we 'may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint . . . .'"[41] The First Circuit quotes approvingly from a Seventh Circuit decision that "[i]t is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."[42] In this case, Schatz's Amended Complaint makes clear, and Schatz's lawyer confirmed at oral argument, that the existence of actual malice must be measured by comparing what the two newspaper articles said against what the flyers said. Their contrast is the only basis for Schatz's actual malice accusation, and he makes the newspaper articles part of his Amended Complaint by attaching them. I conclude, therefore, that Schatz's general allegation of malice is trumped by what appears in the written articles.

---

[39] The Amended Complaint identifies the newspapers and dates, and attaches the articles as Exhibits G and H.
[40] Am. Compl. ¶¶ 38-40.
[41] Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000). See also Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes.").
[42] N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 454 (7th Cir. 1998).

12

Comparing the accusations in the Republican State Leadership Committee's flyers to the newspaper articles certainly establishes that the Committee extrapolated from the articles. The articles do not make any connection between the two funding decisions. They do not say what Blue Hill governmental level approved the funding of the Maine Coalition to Save Schools or when. They do not give specifics about how and when the decision was made not to fund the fireworks. If Schatz's version of what took place is true, then the Republican State Leadership Committee was careless in its extrapolations from the articles. But comparing the two articles' contents to the statements in the flyers does not establish either knowing falsehood or reckless disregard for the truth. (For reckless disregard, Schatz must meet "the heavy burden of providing evidence that the defendants recognized the carelessness with which they were proceeding."[43])

Truth be told, the *Bangor Daily News* article shows that Schatz took responsibility for the decision not to fund the Fourth of July fireworks celebration. That may have been responsible, adult behavior on his part, reflecting proper collegiality and support for his fellow Selectmen with whom he disagreed on the subject, but no reader could tell from the newspaper articles that he had voted in favor of funding the Fourth of July fireworks in 2009. Instead, a reasonable reader could infer that Schatz had voted against funding the fireworks. As for allocating funds to the Maine Coalition to Save Schools in order to repeal the school consolidation law, the *Kennebec Journal* article on

---

[43] Levesque v. Doocy, 560 F.3d 82, 91 (1st Cir. 2009).

13

that topic presented several views that such funding was indeed inappropriate. Although Schatz defended the decision, he also "acknowledged that questions come up when municipalities contribute to political causes."[44] Nowhere in the article was there any indication that the decision to contribute was made by the *voters* of the Town rather than the governing officials (the Selectmen of whom Schatz was one). Relying solely on the *Kennebec Journal* article, it was not knowingly false or reckless disregard for the truth for the Republican State Leadership Committee to infer that in defending the contribution, Schatz was defending a decision he had made as a Selectman.[45] Finally, although the two newspaper stories do not relate the fireworks funding to the Coalition payments, it was not "actual malice" (falsehood or reckless disregard for the truth) to juxtapose their timing (in the August 9, 2009, article—soon after the Fourth of July event without fireworks—Schatz was reported as saying that $5,000 of Blue Hill's $10,000 contribution was paid "recently" to the Coalition[46]), and to question the priorities reflected by the two decisions.[47]

Thus, with no sufficient factual allegations to state a claim of actual malice that is plausible on its face,[48] Schatz's defamation claim must fail.

---

[44] Am. Compl. Ex. H.

[45] Furthermore, according to the Amended Complaint, the voters approved a contribution not to exceed $10,000, "to be used at the discretion of the Selectmen." Am. Compl. ¶ 41. Thus, Schatz and the other Selectmen did play a role in determining the amount to contribute, and whether to contribute, to the Maine Coalition to Save Schools.

[46] Id.

[47] Unlike Levesque, 560 F.3d at 84, where the First Amendment also prevented defamation recovery on the part of a disparaged Maine official (there a school superintendent), these were reputable news sources, not a satiric website as was used by the Fox News hosts in that case.

[48] This is the standard stated in Rios-Colon v. Toledo-Davila, No. 09-2296, 2011 U.S. App. LEXIS 6456, at *6 (1st Cir. Mar. 30, 2011) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (in turn quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007))).

### *(2) Intentional Infliction of Emotional Distress Claim*

At oral argument, Schatz agreed to the dismissal of his claim for intentional infliction of emotional distress.[49]

### *(3) False Light Privacy Claim*

Because the First Amendment protects the Republican State Leadership Committee statements against a defamation claim, it also defeats his claim of publicly placing him in a false light (a type of privacy claim otherwise available under Maine law).[50]

## CONCLUSION

If the allegations of the Amended Complaint are true, James Schatz behaved as a responsible public official, providing objective information to reporters about actions taken by the Town of Blue Hill, and defending even decisions with which he disagreed, whereas the Republican State Leadership Committee played the juvenile role of "gotcha" politics in order to win an election, relying solely on what some unnamed and unaccountable individual[51] evidently regarded as a clever juxtaposition of and extrapolation from two actions reported in two unrelated newspaper articles. But the Amended

---

[49] It would fail in any event on account of the same First Amendment principles that defeat the defamation claim. See Snyder v. Phelps, 131 S. Ct. 1207, 1215-19 (2011); Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 667 (1989) ("we unanimously held that a public figure 'may not recover for the tort of intentional infliction of emotional distress . . . without showing . . . that the publication contains a false statement of fact which was made . . . with knowledge that the statement was false or with reckless disregard as to whether or not it was true," citing Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 56 (1988)).

[50] Cantrell v. Forest City Publ'g Co., 419 U.S. 245, 249 (1974), describing the holding of Time, Inc. v. Hill, 385 U.S. 374 (1967). See also Brown v. Hearst Corp., 54 F.3d 21, 27 (1st Cir. 1995) (where false light claim is a restatement of the defamation claim under a different heading, it cannot escape the same constitutional constraint). Schatz agreed at oral argument that his defamation and false light claims rise and fall together.

[51] The flyers make clear that Schatz's election opponent did not pay for or authorize them.

Complaint with its exhibits makes clear that while there was negligent extrapolation, the extrapolated statements were not made with actual knowledge of their falsity or with a reckless disregard for their truth; instead, they drew plausible, though incorrect, inferences. As a result, this is the classic case recognized by the Supreme Court in describing the sometimes negative consequences of First Amendment protection—that "in the realm of political belief . . . the advocates whom we protect may resort to 'exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement.'"[52] But that is the price that we pay for unfettered debate on public issues as protected by the First Amendment.

Therefore, the defendants' motion to dismiss is **GRANTED**.

**SO ORDERED.**

**DATED THIS 7TH DAY OF APRIL, 2011**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[52] Monitor Patriot Co. v. Roy, 401 U.S. 265, 276 (1971) (quoting Cantwell v. Connecticut, 310 U.S. 296, 310 (1940)).

Republican State Leadership Committee
1800 Diagonal Road, Suite 230
Alexandria, VA 22314

Case 1:10-cv-00528-DBH   Document 37-6   Filed 03/02/11   Page 1 of 2   PageID #: 188

**************BCRLOT**B005 P-1 P156

NON PROFIT ORG
U.S. POSTAGE
PAID
ISSUE MAIL

MRSLC-SS26-017

# No Rockets' Red Glare,
# No Bursting in Air.

## Thanks to JIM SCHATZ...

00169

